No. 24-3949

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ANNA BIANI

*Plaintiff-Appellant*

v.

SHOWTIME NETWORKS, INC., SHOWTIME DIGITAL, INC.,
JOHN LOGAN, DAVID NEVINS AND DOES 1 AND 2

*Defendant-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. CV-23-3844-DMG
Hon. Dolly M. Gee

---

## APPELLANT'S OPENING BRIEF

---

Michael Hamburger
michael.hamburger@whitecase.com
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY  10020
Telephone:  (212) 819-8200
Facsimile:   (212) 354-8113

Michael Songer
michael.songer@whitecase.com
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20006
Telephone:  (202) 626-3600
Facsimile:   (202) 639-9355

*Counsel for Appellant Anna Biani*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ................................................................1

ISSUES PRESENTED.................................................................................2

STATEMENT OF THE CASE.......................................................................4

    **1.**   The Murders & Roses Forum.................................................4

    **2.**   Ms. Biani's Original Character Charlotte Emile Benoit. .........4

    **3.**   Ms. Biani's Original Character Frederick FitzClarence. .........7

    **4.**   Biani's Original Character Landon Otis Lloyd. ......................8

    **5.**   Similarities Between Biani's Characters and Those of the Show............9

    **6.**   Procedural History...............................................................18

STANDARD OF REVIEW .........................................................................22

SUMMARY OF ARGUMENT ....................................................................23

ARGUMENT ...........................................................................................25

I.    The District Court Erred By Failing to Apply This Circuit's Test For Assessing Whether a Complaint Plausibly Pleads Copying. ..................25

    A.   This Circuit Requires a District Court to Compare Both Protected and Unprotected Elements to Assess Whether a Plaintiffs' Complaint Plausibly Pleads Copying. ...................................................................................26

    B.   The District Court Failed to Apply the Correct Test to Assess Whether the Complaint States a Plausible Claim for Copying. .........................30

II.   The District Court Failed to Adhere to the "No Reasonable Juror" Standard and Instead Relied on its Own Subjective Assessment of the Complaint's Allegations of Copying.......................................................32

III.   When Viewed Under the Correct Standard, the Complaint Plausibly Pleads Sufficient Facts to State a Claim for Copying. ............................36

CONCLUSION .......................................................................................39

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alfred v. Walt Disney Co.*,
  821 F. App'x 727 (9th Cir. 2020) ...................................................35

*Astor-White v. Strong*,
  733 F. App'x 407 (9th Cir. 2018) ..................................................34

*Atkins v. Fischer*,
  331 F.3d 988 (D.C. Cir. 2003) ......................................................33

*Baxter v. MCA, Inc.*,
  812 F.2d 421 (9th Cir. 1987) .....................................27, 33, 35, 36

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................22, 23, 37

*Bernal v. Paradigm Talent and Literary Agency*,
  788 F. Supp. 2d 1043 (CD. Cal. 2010) ........................................20

*Briggs v. Blonkamp*,
  70 F. Supp. 3d 1155 (N.D. Cal. 2014)..........................................21

*Copeland v. Bieber*,
  789 F.3d 484 (4th Cir. 2015) .......................................................33

*DC Comics v. Towle*,
  802 F.3d 1012 (9th Cir. 2015) ........................................20, 30, 31

*Dezendorf v. Twentieth Century-Fox Film Corp.*,
  99 F.2d 850 (9th Cir. 1938) .........................................................33

*Feist Publ's, Inc. v. Rural Tel. Serv., Co.*,
  499 U.S. 340 (1991)......................................................................26

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*,
  25 F.3d 119 (2d Cir. 1994) ...........................................................29

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
  9 F.3d 832, n.7 (10th Cir. 1993) ..................................................28

*Jacobsen v. Desert Book Co.*,
  287 F.3d 936 (10th Cir. 2002) .....................................................37

*Kaseberg v. Conaco, LLC*,
260 F. Supp. 3d 1229 (S.D. Cal. 2017)........................................................32

*Kouf v. Walt Disney Pictures & Television*,
16 F.3d 1042 (9th Cir. 1994) ......................................................................33

*L.A. Printex Indus. v. Aeropostale, Inc.*,
676 F.3d 841 (9th Cir. 2012) ......................................................................33

*Loomis v. Cornish*,
836 F.3d 991 (9th Cir. 2016) ......................................................................20

*Meta-Film Assocs., Inc. v. MCA, Inc.*,
586 F. Supp. 1346 (C.D. Cal. 1984) ..........................................................20

*Minx Int'l, Inc. v. Rue 21 Inc.*,
No. 2:15-cv-05645-CAS, 2017 U.S. Dist. LEXIS 107297 (C.D. Cal. July 10, 2017) ...........................................................................................................38

*Positive Black Talk Inc. v. Cash Money Records, Inc.*,
394 F.3d 357 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)..........................................................29

*Rentmeester v. Nike*,
883 F.3d 111 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d 1051
....................................................................................................passim

*Shaw v. Lindheim*,
919 F.2d 1353 (9th Cir. 1990), *overruled on other grounds by Skidmore*, 952 F.3d 1051
....................................................................................................passim

*Stabile v. Paul Smith Ltd.*,
137 F. Supp. 3d 1173 (C.D. Cal. 2015) ................................................20, 36

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) ......................................................................32

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000), *overruled in part by Skidmore v. Led Zepplin*, 952 F.3d 1051 (9th Cir. 2020) ..............................................................passim

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983) ....................................................................33

*Williams v. Gaye*,
    895 F.3d 1106 ..................................................................32

*Zalewski v. Cicero Builder Dev., Inc.*,
    754 F.3d 95 (2d Cir. 2014) ...........................................29

*Zindel v. Fox Searchlight Pictures, Inc.*,
    815 F. App'x 158 (9th Cir. 2020) .................................35

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................22

## STATUTES AND RULES

17 U.S.C. § 102(b) ..............................................................27

28 U.S.C. § 1291 ...................................................................1

28 U.S.C. § 1331 ...................................................................1

28 U.S.C. § 1332 ...................................................................1

28 U.S.C. § 1338 ...................................................................1

Fed. R. App. P. 10 ...............................................................16

Fed. R. Civ. P 12 ..........................................................passim

Fed. R. Civ. P 50 .................................................................32

Fed. R. Civ. P 56 .................................................................20

## MISCELLANEOUS

4 Melville B. Nimmer, Nimmer on Copyright, § 13.01 ...............................26, 27

4 Melville B. Nimmer, Nimmer on Copyright, § 13D.06 ...........................30, 34

4 Melville B. Nimmer, Nimmer on Copyright, § 13D.08 .................................38

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under the U.S. Copyright Act, 17 U.S.C. §§ 101 et seq., as well as 28 U.S.C. §§ 1331, 1332 and 1338(a), (b). This timely appeal arises from an order dismissing Appellant's complaint under Fed. R. Civ. P(12)(b) dated March 29, 2024 and entered on the District Court's docket on April 8, 2024 (the "Order" (1-ER-4)), and an Order of Dismissal With Prejudice and Judgment dated May 24, 2024 (1-ER-2). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Appellant, Anna Biani (hereinafter "Biani" or "Appellant"), filed suit alleging that the Showtime television series *Penny Dreadful* (the "Show") infringed her copyright in literary works that she created on a role-playing website named "Murders & Roses: Victorian London Crime and Scandals." Despite the numerous similarities between Appellant's works and the Show pled in the complaint, the District Court dismissed Appellant's copyright infringement claims because it found that the complaint did not plausibly plead that Showtime Networks, Inc., Showtime Digital, Inc., John Logan, David Nevins and Does 1 and 2 (collectively "Appellees") copied Appellant's works.

The District Court's decision gives rise to the following questions:

1. Whether, in assessing if the complaint plausibly pled *copying*, the District Court erred by improperly applying this Circuit's test for *unlawful appropriation* and "filtering out" elements of Appellant's works that it deemed to be unprotectable before comparing Appellant's works and the Show to determine whether the similarities between the works were sufficiently probative of copying when the test for copying in this Circuit required the District Court to consider and compare both the protectable *and* unprotectable elements of Appellant's works to the Show.

2. Whether, in characterizing the copyrighted works' literary elements and comparing them to the Show, the District Court improperly substituted its subjective judgment for that of the fact-finder, contrary to the rule that dismissal

of a copyright-infringement claim at the Rule 12(b)(6) pleading stage is proper only if no reasonable juror could find that the plaintiff is entitled to relief.

3.      Whether, in view of the allegations in the complaint as to the similarities between Appellant's work and the Show that are probative of copying, the District Court erred in requiring the complaint to plead additional facts as to Appellees' access to Appellant's works to survive dismissal at the pleadings stage.

## STATEMENT OF THE CASE

### 1.     The Murders & Roses Forum.

In January 2011, Biani joined an online role-playing forum entitled "Murders & Roses: Victorian London Crime and Scandals" (the "Forum"). 3-ER-428 at ℙ 9; 3-ER-436 at ¶ 38. An online role-playing forum is a website that allows a user to develop a character and to interact with other characters in the forum to create plot lines based on a particular setting and theme. 3-ER-434 at ¶ 31. The setting of the Forum was late 19th Century London and the theme was crimes and scandals. 3-ER-428 at ¶ 9. For their plotting exercises, Forum users could select from a range of well-known Victorian characters, including those from Gothic horror novels like Count Dracula, Dr. Jekyll, and Victor Frankenstein, and other characters not associated with the genre, like Dorian Gray. *Id.*; 3-ER-434 at ¶ 32. Users could also create plot lines based on their own original characters, which first needed to be approved by the moderators of the Forum. 3-ER-429 at ¶ 9. Between 2011 and 2013, Biani made more than one thousand posts to the Forum and developed at least fifteen original characters. 3-ER-429 at ¶ 10.[1]

### 2.     Ms. Biani's Original Character Charlotte Emile Benoit.

On January 31, 2011, Biani posted on the Forum the description of a new character named Charlotte Emilie Benoit ("Charlotte"). 3-ER-436 at ¶ 39. Biani

---

[1] Ms. Biani obtained copyright registrations for the descriptions of her original characters as well as her individual postings on the Forum. 3-ER-431 at ¶ 15; 3-ER-456 to -81 (Exhibits A-J).

4

described Charlotte as a slim woman in her early thirties, 5'6", with long, dark brown, wavy hair who typically wears a matching jacket and skirt with a high-collared shirt and a veiled top hat or, for more special occasions, extravagant gowns with low-cut décolletages. 3-ER-436 to -37 at ¶ 40.

Charlotte's personality is "persistent and positive," but she is also "seductive and controlling" and uses her charm to manipulate people. 3-ER-437 to -38 at ¶ 41. Charlotte is "feminist and rebellious" and reacts with violence and rage to the mistreatment of women. *Id.* Charlotte can be courteous and well-mannered, as was expected of the women of her time, when she calculates an opportunity to gain the trust of others, but more often she rejects Victorian customs by engaging in activities not meant for women. *Id.* Charlotte is remorseless about her violence towards others, feeling justified in her immoral acts, and can be sexually perverted to the extreme, taking pleasure in introducing the innocent to her depraved sexuality. *Id.* In her stories, Charlotte interacts, develops relationships, and engages in conflict with other characters in the Forum, including canonical Victorian characters like Victor Frankenstein. 2-ER-160.

As a child, Charlotte was "mentally disturbed" and had a "compulsive obsession [with] fairytales with dark scenarios, which soon developed into the fanaticism of occult." 3-ER-438 at ¶ 42. Charlotte was "[i]nfatuated by the idea of witchery" and in her early years "the little pale brunette perpetually stole magic books from anyone and anywhere she could." *Id.* As she grew up, "Charlotte

5

became more aware of the injustices in the suffocating image of the proper role of women, so-called 'feminine ideal.' It was then she made a vow within herself to fight for the rights of her gender for the rest of her life." 3-ER-438 to -39 at ¶ 42. Charlotte ultimately assumed the identity of a "witch doctor" who studied green witchcraft involving the use of herbs and became known for her healing powers. 3-ER-437 to -38 at ¶ 41.

The Forum required users who created original characters to identify the actor whose likeness would best portray the user's character. 3-ER-436 at ¶ 36. For Charlotte, Biani selected Eva Green, as reflected in the following excerpt from Biani's character description of Charlotte:



{Charlotte Émilie Benoit}

**Age:**
[/color] 31
**Gender:** Female
**Orientation:** Omnisexual
**Occupation:** Assassin
**Job:** Self-Acclaimed Witch Doctor
**Needed Character/ Themes claim:** None
**Play By:** Eva Green

3-ER-439 at ¶ 43.  The Forum moderators praised Biani's Charlotte character, stating that she was a "[v]ery interesting" and "original" character unlike any others in the Forum, yet "still believable in our Victorian era."  3-ER-439 at ¶ 44.

### 3.    Ms. Biani's Original Character Frederick FitzClarence.

On May 22, 2011, Biani posted to the Forum the description of a new character named Frederick FitzClarence ("Frederick").  3-ER-440 at ¶ 45.  Biani described Frederick as an "imposter" "[c]onstantly seeking reassurance and approval" and prone to being "inappropriately sexually provocative."  *Id.*  He is prone to "seizures" and "dark thoughts" and has been so since he was a youth. *Id.*  Because of his seizures, the local priests who knew Frederick considered him to be "the devil's child" who spreads "bad luck" to anyone who spends time with him.  *Id.*

Frederick came to be associated with an evil otherworld because of his early affliction with seizures.  3-ER-440 at ¶ 46.  While walking one day with a priest in the garden of FitzClarence mansion, Frederick experienced a grand mal seizure.  *Id.*  Terrified at the sight, the priest concluded that Frederick was possessed by evil.  *Id.*  As a result of the priest's diagnosis, Frederick's family locked him in the family mansion to shield him from others.  *Id.*  While Frederick was so quarantined, the priests visited him every other day in an effort to exorcize him but with no success.  *Id.*  Over time, Frederick became histrionic and in dramatic fashion engaged in a tryst with one of the nannies of the mansion, who were Frederick's only other visitors.  *Id.*  This caused the priests to conclude that

Frederick was a source of evil beyond repair and it prompted his immediate family to abandon him. *Id.*

When Frederick was nineteen, his uncle arranged for Frederick's release. 3-ER-441 at ¶ 47. The uncle took Frederick into his care and moved Frederick to London. *Id.* There, Frederick entered Victorian society playing the role of an imposter who hides his real self and its past from others. *Id.* Over time, Frederick the imposter ultimately loses touch with himself altogether and becomes uncertain of his true identity and purpose. *Id.*

The Forum moderators approved the Frederick character on May 22, 2011, noting that the character description was "amazing and well done," and that Frederick was "[v]ery interesting" and "different from" Biani's other characters. 3-ER-441 at ¶ 48.

### 4.     Biani's Original Character Landon Otis Lloyd.

In March 2011, Biani posted the description of a new character named Landon Otis Lloyd ("Landon"). 3-ER-441 at ¶ 49. Biani described Landon as an "explorer" who lives a "nomadic lifestyle, constantly traveling from one country to another to learn about different cultures, humans, animals." *Id.* In appearance, Landon "wears his brown pinstripe sack coat and pinstripe pants, white dress shirt, tawny vest, coffee colored leather shoes and bowler hat, black tie and gold pocket watch." *Id.* Landon has had a power of "clairvoyance" since he was a small child, which he further developed on his travels as an adult, and "[h]is dreams often tell him something about [. . .] future events." *Id.*

8

Landon ultimately decides to end his nomadic existence and settles in London where he becomes a private investigator, using his clairvoyance to solve mysteries. 3-ER-441 at ¶ 50. He eventually embarks on a very personal mission in London: "to find his long-lost half-sister, Irene Adler" with whom he lost touch because he chose to pursue a life of adventure at the expense of his family. 3-ER-441 to -42 at ¶ 50. Even though he hates to stay in the same place for too long, Landon's quest to find his sibling gives him a reason to remain in London. *Id.*

The Forum moderators approved Biani's original Landon character on March 19, 2011, noting that Biani had created "something really good." 3-ER-442 at ¶ 51.

### 5. Similarities Between Biani's Characters and Those of the Show.

The Show premiered on Showtime On Demand and other platforms in the United States in April and May 2014. 3-ER-442 at ¶ 52. The Show aired over three seasons from 2014 to 2016 to great acclaim and was nominated for numerous awards. 3-ER-426 at ¶ 2; 3-ER-443 at ¶ 56.

The Show tells the story of Vanessa Ives, a pale brunette who dresses in matching jacket and skirt with a high-collared shirt or in extravagant evening gowns. 3-ER-442 at ¶ 53; 3-ER-444 to -46 at ¶ 57. Like Charlotte in Biani's works, Vanessa is portrayed by Eva Green:

 

**Vanessa Ives[2]**

Vanessa is a Victorian-era woman living in London whose struggle with her inner evil forms the basic conflict of the show. 3-ER-442 at ¶ 53. Like Charlotte, Vanessa is a powerful woman with a seductive, alluring presence who is schooled in the social graces of the time, yet rebels against them. *Id.* Vanessa interacts with canonical 19th Century characters over the course of the Show, including, like Charlotte, Victor Frankenstein, and other characters, like Count Dracula and Dorian Gray, who were also characters on the Forum. *Id.* But Charlotte's relationship with Sir Malcolm Murray and his quest forms the central storyline of the Show. *Id.*

Like Landon Lloyd, Sir Malcom is a professional explorer who has returned to London to find a missing family member: his daughter Mina. 3-ER-442 at ¶ 54. Sir Malcolm and Vanessa have known each other since Vanessa was a young girl, as the Ives and Murray families were neighbors and Vanessa and

---

[2] 3-ER-444 to -46 at ¶ 57.

Mina were best friends. *Id.* Yet their relationship was fractured after Vanessa witnessed Sir Malcolm having sex with Vanessa's mother. *Id.* In retaliation for this act of betrayal, Vanessa seduced Mina's fiancé on the eve of their wedding, an event that occurred just before Mina disappeared. *Id.* These events tragically unite Vanessa and Sir Malcolm, and Sir Malcolm draws upon the guilt that Vanessa experiences over them to enlist her help in finding Mina. *Id.*

We learn during the Show that, after her encounter with Mina's fiancée, Vanessa descended into a deep darkness during which she appeared to be visited by evil forces in seizure-like episodes. 3-ER-443 at ¶ 55. Like Frederick, Vanessa's seizures led others around her to believe she was possessed by evil spirits. *Id.* Like Frederick, Vanessa was institutionalized for treatment but was never cured of her inner evil and continued to struggle to understand and grapple with the conflicts within her. *Id.* Frederick's early seizure episode that marked his connection with the evil otherworld occurred in the garden of his family's manor. 3-ER-440 at ¶ 46. In the Show, Vanessa has an early grand mal seizure and collapses while in the garden of her family's manor, which is where she witnessed the act of Sir Malcom's betrayal that caused her to pass over to the dark side. (Season One, Episode 5, 24:35-25:25:30).

Sir Malcolm enlists Vanessa's help to find Mina because Vanessa is endowed with strange and mysterious powers. 3-ER-443 at ¶ 55. Like Landon, Vanessa has the power of clairvoyance—she is a medium who can reveal the past and future—and her revelations come to her when she communes with evil spirits

11

through seizures just like Frederick.  *Id.*; 3-ER-445 to -46 at ¶ 57.  Indeed, one of the most iconic scenes of the Show is one in which Vanessa channels spirits during a séance, her body contorting itself wildly as a seizure grips her and the spirits speak through her.  (Season One, Episode 2, 30:00-38:33).  Like Charlotte, Vanessa is a witch and herbalist; she can marshal the magical powers of plants and nature.  3-ER-443 at ¶ 55.  Together, Vanessa and Sir Malcolm, assisted by other characters, search for Mina, as Vanessa seeks to understand her own internal conflict and identity and ultimately retain her faith in good over evil, just as Frederick suppresses his own evil in his search for his true identity and purpose.  3-ER-443 at ¶ 46; 3-ER-443 at ¶ 55.

In Biani's works, Landon, the explorer, uses clairvoyant powers to find his missing *half-sister*.  3-ER-441 at ¶ 50.  Sir Malcom, the British explorer in the Show, enlists the aid of Vanessa's clairvoyant powers to find Mina, with whom Vanessa has a bond *closer than sisters*, which is the title of Season One, Episode Five of the Show.[3]  In the course of searching for his half-sister, Landon has a premonition of a pale blond woman with a bloodied gash in her stomach.  2-ER-198.  In the Show, Mina appears as a pale blond woman in Vanessa's premonitions.  (Season One, Episode 3, 13:30-14:08).

Like Charlotte, Vanessa exhibits a rebelliousness atypical of women in Victorian England.  When she is asked by a character on the Show to teach him

---

[3] *See* https://www.imdb.com/title/tt2991752/ (IMDb webpage for Season One, Episode 5 of the Show, entitled "Closer Than Sisters").

the "social graces," Vanessa responds with contempt: "Well, that's a long list. There's the painstaking ritual of serving tea, tedious decorum at balls, meaningless social banter." (Season 2, Episode 7, 20:25-22:21). Later in the Show, a doctor says to Vanessa: "You are not a woman of convention or you wouldn't be here. But you like to pretend you are so people don't notice you but you sometimes like that as well and can dress to draw the eye. But then you think the men that look at you are fools or worse, to be taken in by such an obvious outward show." (Season 3, Episode1, 38:56-37:10). After Vanessa's mother tries to discipline Vanessa for seducing Mina's fiancé, Vanessa chastises her mother for having had an affair with Sir Malcolm: "How dare you speak to me of shame? Get upstairs yourself and make amends to my father!" (Season One, Episode 5, 23:06-23:29). She takes a similar tone with Sir Malcolm: "You think you've suffered. You think you know blood. You think you've walked on corpses. Spread them from here to the horizon and I have walked further! You weak, foul, lustful vainglorious man. How dare you presume to speak to me of death?" (Season One, Episode 5, 49:41-50:58).

For both Charlotte and Vanessa, sex is inextricably linked with violence. When asked by one of her lovers why she does not eat meat, Charlotte imagines roasting and eating his flesh. 2-ER-163. She kills another lover after kissing him passionately and chaining him to her bed. *See* 2-ER-306 to -307. In the Show, Vanessa says this to Mina about witnessing their parents having sex: "My mother. Your father. More than the shock, the sinfulness, the forbidden act, there was

13

this. I enjoyed it. Something whispered. I listened." (Season One, Episode 5, 10:27-11:35). After Vanessa seduces Mina's fiancé in an act of revenge, Vanessa's subsequent sexual encounters are fraught with violence and danger. Vanessa has an intensely physical sexual encounter with a sailor whom she meets on the street after leaving the séance in a state of heightened agitation. (Season One, Episode 2, 38:33-39:52). Later, Vanessa seduces Dorian Gray and, after Gray uses a knife to remove Vanessa's corset, Vanessa uses the knife to cut Gray and licks his blood. (Season 1, Episode 6, 43:19-44:35).

Charlotte and Vanessa both exhibited a psychological darkness from early on. Charlotte was a mentally disturbed child who was obsessed with macabre fairytales and the occult. 3-ER-438 at ¶ 42. A similar darkness descended on Vanessa after she witnessed her mother's encounter with Sir Malcom in the maze. Vanessa says: "But in me, there was a change. I marked that night in the hedge maze. Perhaps it was always there. Little acts of wickedness. Harmless, of course, something any girl would do. I told myself it was no more than mischief. But I knew it was more. Of course I did." (Season 1, Episode 5, 12:25-12:55).

As they did for Charlotte, those little acts of wickedness would grow into acts of evil as both characters developed their natural talents in witchcraft. Charlotte, in her junior years was "[i]nfatuated by the idea of witchery" – "the little pale brunette perpetually stole magic books from anyone and anywhere." 3-ER-438 at ¶ 42. As to her power of witchcraft, Charlotte states: "I was born with it! I don't need to learn it; I just need to polish it." 3-ER-361. In the Show,

14

Vanessa meets a character named the Cut-Wife and begins a sort of apprenticeship in witchery. The Cut-Wife says of their respective powers of witchcraft: "I learned [the gift]. You were born with it . . . Because I see your pain, girl. You always been like you are, even as a little thing." (Season 2, Episode 3, 16:37-16:56). Through her travels around England, Charlotte becomes accomplished in green witchcraft – witchcraft using herbs – and practices white magic. 3-ER-439 at ¶ 42. Vanessa, too, learns through her travels witchcraft using herbs, and the ways of Daywalkers, who practice white magic. (Season 2, Episode 3, 26:35-28:02).

Charlotte and Vanessa each have a fraught relationship with the Church. Charlotte visits St. Pancras Church to "observe the architecture and the painted icons" but is asked to leave by a young priest who tells her the Church does not approve of her witchcraft. Charlotte complies and sits on a bench outside where she waits to seduce the priest. 2-ER-149. In a flashback, Charlotte recalls that her fraught relationship with the Church "began in the monastery . . . a sixteen year old Charlotte . . . crying and groaning from unbearable pain . . . blood dripping down her legs." 3-ER-300. Charlotte later encounters a nun who helps Charlotte retrieve some personal items she dropped while losing her balance. 3-ER-362. When she realizes her helper is a nun, Charlotte experiences an intense repulsion that makes Charlotte's throat tense. *Id.*

In the Show, Vanessa at one point sits on a bench outside a church speaking with a young girl who notices Vanessa's reluctance to enter the church. (Season

One, Episode 4, 5:50-8:04).  Vanessa intimates to the young girl that she cannot enter.  *Id.*  Later in the Show, Vanessa explains that nuns make her "nervous" because she "was raised in the faith" and that this "was arduous" for her: "The almighty and I have a challenging past, not sure we're speaking these days."  In the final season of the Show, Vanessa reflects on her relationship with God and says, "I have left my faith, or it has left me.  Thus, my only prospects seemed only a long, dark corridor without an end.  I have done things in my life for reasons that seemed right and even moral in their violent immorality and now I stand without that God upon whom I have always depended." (Season 3, Episode 1, 49:12-50:55).

Charlotte and Vanessa both have relationships with otherworldly assistants or "familiars" – William Talbot in Biani's works and Fenton in the Show – whose depictions are strikingly similar.   3-ER-447 at ¶ 62.   William is Charlotte's captive-turned minion.  Deposit Copy of May 2, 2011 Character Description of William Talbot, Copyright Registration No. TX0009262305.[4]  He is a vicious

---

[4] Appellant's complaint referenced and therefore incorporated her character description of William Talbot for which she obtained a copyright registration. *See* 3-ER-449 at ¶ 73 (identifying Copyright Registration No. TX0009262305 (2012.05.02 – Anna Biani MR – William Talbot Character Description); 3-ER-463, Ex. D (Copy of Copyright Registration No. TX0009262305); *see also* 3-ER-447 at ¶ 62 (comparing description of William Talbot to Fenton).  In their motion to dismiss the complaint, Appellees attached as exhibits certified deposit copies of Biani's character descriptions of Charlotte, Frederick and Landon; however, Appellees did not include the deposit copy of Biani's description of William Talbot.  2-ER-104 at ¶ 4.  Appellant will make a motion under Federal Rule of Appellate Procedure 10(e) to supplement the record with a deposit copy of the

satanist who comes to view Charlotte as his "master" and helps Charlotte dispose of corpses. *Id.* His eyes are dark cobalt blue, almond shaped, deep-set and large in size. *Id.* He has a sickly pale complexion, gaunt face and dark circles for eyes that betray a bright streak of madness. *Id.* He is lanky, literally skin and bones, with untidy, raven-black hair and looks "mostly like a filthy tramp." *Id.* After keeping William in captivity for a time, Charlotte ultimately recruits him to be her personal assistant. *Id.*

In the Show, Fenton is a vampire's familiar who preys on flesh and is captured by Sir Malcolm and Vanessa. (Season One, Episode 3, 37:03-40:51). Sir Malcolm and Vanessa attempt to restore Fenton to a human state so he can help them find Mina. (Season One, Episode 4, 21:04-23:43). Fenton refers to Dracula as his "Master" and to Vanessa as "Mother" and calls Vanessa a "fucking devil whore" when she offers him an apple to eat. (Season One, Episode 4, 26:07-27:44). Like William Talbot, Fenton is depicted as a wild and vicious, lanky man, with a pale complexion, gaunt face, untidy hair and dark, deep-set eyes that indicate madness, as reflected in the below still-image of Fenton from the Show:

---

character description of William Talbot, which is incorporated into Appellant's complaint by reference.



**Fenton**

In summary, the similarities between Biani's works on the Forum and the Show as alleged in the Complaint include, but are not limited to: (i) the common physical appearance, traits and personalities of Charlotte and Vanessa, including their rejection of Victorian norms for women, their transgressive sexuality, their power to seduce and control men, their fraught relationships with religion and the Church, and their common vocation as witches; (ii) the common use of the likeness of Eva Green to depict Charlotte and Vanessa; (iii) Frederick's and Vanessa's common histories of seizures and the association of those seizures with possession by evil spirits; (iv) the common plot arc of an explorer searching for a missing family member using the powers of clairvoyance; and (v) the strikingly similar familiars William and Fenton.

### 6.    Procedural History

Ms. Biani filed a complaint for copyright infringement against Appellees on May 18, 2023.  3-ER-425.  In her complaint, Biani alleged that the characters of Charlotte, Frederick and Landon are entitled to copyright protection and that Appellees infringed her copyright through the substantially similar depiction of

18

the character of Vanessa on the Show. 3-ER-431 at ¶¶ 16-17. Biani further alleged that Appellees or their agents accessed Biani's works on the Forum either directly or through the Forum's moderators, who were known on the Forum by the names of "Lord Charles Carmichael" and "Dorian Gray" and are named in the complaint as "Doe" defendants, and that the striking similarities between Biani's works and the Show supported an inference that Appellees copied Biani's works. *See, e.g.*, 3-ER-429 at ¶ 9; 3-ER-432 at ¶ 23; 3-ER-450 at ¶ 74; 3-ER-451 at ¶ 82.

Biani's complaint is consistent with a theory that Appellees or individuals associated with Appellees accessed Biani's postings on the Forum when conducting research for the Show and/or that, after Appellees publicly announced their plans for the Show, the moderators of the Forum shared with Appellees or individuals associated with Appellees Biani's original characters on the Forum, which the moderators found to be "original," "believable in our Victorian era," "amazing," and "something really good." *See* supra 10-12.

Appellees moved to dismiss the complaint on August 4, 2023. 2-ER-73. The District Court initially scheduled oral argument on the motion for September 8, 2023, but, on September 7, 2023, it entered an order vacating the hearing stating and finding that the motion was appropriate for decision without oral argument.

In an order dated March 29, 2024, and entered on the docket on April 8, 2024, the District Court granted Appellees' motion. 1-ER-4. The District Court

19

found that Ms. Biani's characters are entitled to copyright protection under *DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015). 1-ER-9. On the separate issue of whether the complaint adequately pled that Appellees had access to and copied Ms. Biani's works, however, the District Court found that the allegations in the complaint "do no more than suggest a bare possibility of access," which is insufficient to sustain a claim of copying. 1-ER-10 (quoting *Briggs v. Blonkamp*, 70 F. Supp. 3d 1155, 1166 (N.D. Cal. 2014) (granting *summary judgment* in favor of the defendant on the issue of access).

Each of the authorities on which the District Court relied to support its legal conclusion that the complaint did not allege facts sufficient to state a claim of access by Appellees to Ms. Biani's copyrighted works *at the Rule 12(b)(6) stage* involved either *summary judgment* or *post-trial* rulings entered after the parties had completed fact and expert discovery. *See* 1-ER-9 to -10 (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (affirming denial of *post-trial motion* for new trial), *overruled in part by Skidmore v. Led Zepplin*, 952 F.3d 1051, 1066 (9th Cir. 2020); *Bernal v. Paradigm Talent and Literary Agency*, 788 F. Supp. 2d 1043, 1056-57 (CD. Cal. 2010) (granting *summary judgment*); *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1356-57 (C.D. Cal. 1984) (granting motion, pursuant to *Rule 56(d)*, establishing that creators had no access and denying motions for partial *summary judgment*); *Loomis v. Cornish*, 836 F.3d 991, 995-96 (9th Cir. 2016) (affirming denial of *summary judgment*); *Stabile v. Paul Smith Ltd.*, 137 F. Supp. 3d 1173, 1187 (C.D. Cal. 2015) (granting

*summary judgment*); *Briggs*, 70 F. Supp. 3d at 1166 (granting defendant's motion for *summary judgment*).[5]

The District Court next considered whether the complaint plausibly alleged that the similarities between Ms. Biani's copyright characters were strikingly similar to the characters on the Show so as to support a claim of *copying* in the absence of evidence of access by Appellees. 1-ER-10. To undertake this inquiry, however, the District Court erroneously applied this Circuit's "extrinsic test" for *unlawful appropriation*, which, according to the District Court, required it to "filter[] out the unprotectable elements" of Ms. Biani's copyrighted works before comparing her works to the Show. *Id*. After so filtering, the District Court concluded that, "[e]ven if there are some remaining protectible elements, and accepting Biani's characterizations, it cannot be said that any similarities are 'striking' enough such that would 'preclude the possibility of independent creation.'" 1-ER-11. In so doing, the District Court failed to apply the correct test for copying, which required it to consider *both* the protected *and unprotected* elements of Appellant's works to assess whether the similarities between Appellant's works and the Show are ones that would not be expected if the works had been created independently, and it improperly applied its own subjective judgments about the works' literary qualities instead of comparing the works from the perspective of a reasonable juror.

---

[5] In support of their motion to dismiss the complaint, Appellees relied on cases decided at the summary judgment stage. *See* 2-ER-61 at n.3.

Based on the foregoing findings, the District Court granted Appellees' motion to dismiss but granted Ms. Biani leave to amend the complaint. The District Court stated: "If Biani is able to provide additional plausible allegations *that state a claim on the issue of access*, the Court can revisit this analysis under the lower 'substantially similar' standard." 1-ER-12 (emphasis added). On April 29, 2024, Ms. Biani informed the District Court that she did not intend to file an amended complaint. 2-ER-18. On May 24, 2024, the District Court entered an Order of Dismissal with Prejudice and Judgment in favor of Appellees. 1-ER-2. On June 24, 2024, Ms. Biani timely filed a Notice of Appeal of the Order.

## <u>STANDARD OF REVIEW</u>

The appellate court reviews dismissals under Federal Rule of Civil Procedure 12(b)(6) *de novo*, accepting the plaintiff's allegations as true and construing them in the light most favorable to the plaintiff. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009). At this stage of litigation, a complaint's factual allegations need not be detailed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). They "must be enough to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Id.* at 555, 570. To state a claim for copyright infringement, a plaintiff must plausibly allege ownership of a valid copyright and copying of protected elements of the work. *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990), *overruled on other grounds by Skidmore*, 952 F.3d 1051.

Here, Appellants have alleged facts that have "raise[d] a right to relief above the speculative level" and "is plausible on its face." *Twombly*, 550 U.S. at 555, 570. Thus, this Court should reverse the District Court's dismissal of Biani's complaint and remand for further proceedings.

## SUMMARY OF ARGUMENT

To state a claim for copyright infringement, a complaint must plausibly plead (i) ownership of a valid copyright in the allegedly infringed work and (ii) copying of the protected elements of the work. *Shaw*, 919 F.2d at 1356. Here, the District Court found that Appellant's original characters are subject to copyright protection. But the District Court dismissed Appellant's complaint because it concluded that the complaint did not plausibly plead that Appellees *actually copied* Appellant's copyrighted works. This Court should reverse the grant of Appellees' motion to dismiss because the District Court failed to apply the correct test to assess whether the complaint plausibly alleged facts probative of copying. Had the District Court applied the correct test, the outcome would have been different.

A plaintiff may establish copying by presenting evidence that the defendant had access to the plaintiff's work and that the similarities between the works are probative of copying. In the absence of evidence of access, a plaintiff may establish copying by showing that the similarities between the works are so striking as to preclude independent creation. In this Circuit, when assessing whether the similarities between the plaintiff's and the defendant's works are

striking and probative of copying, a court must consider *not only the protectable* elements of the plaintiff's works *but also the unprotectable elements*. *Skidmore*, 952 F.3d at 1064; *Rentmeester v. Nike*, 883 F.3d 111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d 1051.

Here, the District Court committed reversible error because it excluded what it deemed as a matter of law to be unprotectable elements of Biani's works before evaluating whether the similarities between Biani's works and the Show plead in the complaint were plausibly probative of copying. Instead of applying the correct test for *copying*, which requires a court to compare *both* protectable *and unprotectable elements* of the plaintiff's work to the accused infringing work, the District Court applied this Court's "extrinsic test" for *unlawful misappropriation*, which requires the court to consider only the protectable elements of a plaintiff's work to assess whether the defendant's copying of plaintiff's work was unlawful.

By applying the incorrect test for copying, the District Court ignored facts plausibly pled in the complaint upon which a reasonable juror could find that Appellees copied Appellant's works, including the many striking similarities between the appearance, traits, personalities and personal histories of Charlotte, Frederick, Landon and William, on the one hand, and those of Vanessa, Sir Malcolm and Fenton on the other, which the District Court excluded from consideration as unprotectable elements. The District Court also ignored that both Appellant and Appellee used the likeness of the same actress, Eva Green, to

24

portray their strikingly similar characters Charlotte and Vanessa, a fact pled in the complaint that the District Court did not address at all in its Order.

The District Court compounded this error by making determinations at the Rule 12(b)(6) stage, without the benefit of expert discovery, as to what is protectable and what is not protectable in Biani's Works and whether the similarities between the Works and the Show are probative of copying. By doing so, the District Court improperly applied its own subjective evaluation to the facts when the correct inquiry is whether *no reasonable juror* could find the similarities plead in the complaint to be probative of copying. By refusing to allow the factfinder to decide subtle issues of literary interpretation, with the benefit of expert opinion, the District Court deprived Biani of the due process that the "no reasonable juror" standard necessarily safeguards.

Because the complaint plausibly alleges similarities between the Works and the Show that are probative of copying under this Court's test for copying, it was an error for the District Court to require Biani to plead more facts about Appellees' access to Biani's Works for her complaint to survive dismissal at the Rule 12(b)(6) stage. Reversal of the District Court's Order is warranted.

## **ARGUMENT**

### I. **The District Court Erred by Failing to Apply This Circuit's Test for Assessing Whether a Complaint Plausibly Pleads Copying.**

In this Circuit, when a court evaluates whether a copyright infringement complaint plausibly states a claim for copying, a court may not limit its

comparison of the copyrighted work and the allegedly infringing work to the protected elements of the copyrighted work only. It must also consider the unprotected elements of the copyrighted work in the comparison. The District Court violated this principle of law in granting Appellees' motion to dismiss the complaint.

A.   **This Circuit Requires a District Court to Compare Both Protected and Unprotected Elements to Assess Whether a Plaintiffs' Complaint Plausibly Pleads Copying.**

To state a claim for copyright infringement, a complaint must plausibly plead (i) that the plaintiff owns a valid copyright and (ii) that the defendant copied protected elements of the plaintiff's copyrighted works. *Feist Publ's, Inc. v. Rural Tel. Serv., Co*., 499 U.S. 340, 361 (1991); *Shaw*, 919 F.2d at 1356.

The second element, in turn, has two distinct components: (i) "copying" and (ii) "unlawful appropriation." *Rentmeester*, 883 F.3d at 1117 (citing *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1164-65 (9th Cir. 1977), *overruled on other grounds by Skidmore*, 952 F.3d 1051; *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B] (2017)). Proof of copying by the defendant is necessary because independent creation is a complete defense to copyright infringement no matter how similar the plaintiff's and the defendant's works are. *Rentmeester*, 883 F.3d at 1117; *Skidmore*, 952 F.3d at 1064. Proof of unlawful appropriation is necessary because copyright law does not forbid all

26

copying; for example, it does not forbid the copying of "ideas" or "concepts." 17 U.S.C. § 102(b); *see Rentmeester*, 883 F.3d at 1117.

Where a plaintiff lacks direct evidence of copying, she may prove copying circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987). Where a plaintiff lacks proof of access, she may prove copying by showing that the probative similarities between the works are striking. *Id*. Such proof creates a presumption of copying, which the defendant can then attempt to rebut by proving independent creation. *Three Boys Music Corp.*, 212 F.3d at 486.

As this Court explained in *Rentmeester*, while courts have used the same term – "substantial similarity" – to describe both the degree of similarity relevant to proof of copying and the degree of similarity needed to establish unlawful appropriation, the term means different things in those two contexts. "To prove copying, the similarities between the two works *need not be extensive*, and they *need not involve protected elements of the plaintiff's work*. They just need to be similarities one would not expect to arise if the two works had been created independently." *Rentmeester*, 883 F.3d at 1117 (emphasis added) (citing *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992), 4 Nimmer on Copyright § 13.01[B]); *see also Skidmore*, 952 F.3d at 1064 ("A finding of [probative or striking] similarity may be based on the overlap of unprotectable as well as protectable elements.") (citing *Rentmeestere*, 883 F.3d at 1117).

27

To prove unlawful appropriation, on the other hand, "the similarities between the two works must be 'substantial' and they must involve protected elements of the plaintiff's work." *Rentmeester*, 883 F.3d at 1117; *see also Skidmore*, 952 F.3d at 1064. To determine whether a defendant's work is substantially similar to the plaintiff's copyrighted work for the purpose of unlawful appropriation, this Court applies a two-part test: an extrinsic test, which compares the objective similarities between only the protected elements of the plaintiff's work and the defendant's work; and an intrinsic test, which compares the works from the perspective of the ordinary reasonable observer. *Skidmore*, 952 F.3d at 1064. Unlike the test for *copying*, the extrinsic test for *unlawful appropriation* requires a court to "filter out" the unprotected elements, such as "ideas and concepts, material in the public domain, and *scènes à faire* (stock or standard features that are commonly associated with the treatment of a given subject)." *Rentmeester*, 883 F.3d at 1118.

This Court adopted a broad, holistic approach to proof of copying, under which a court must compare both protectable and non-protectable elements of the plaintiff's work to that of the defendant. In contrast, the narrow inquiry for unlawful appropriation limits the comparison to protectable elements only. A distinction between the two tests is consistent with the approach taken by other Circuits. For example, in *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, the Tenth Circuit explained:

We acknowledge that unprotectable elements of a program, even if copied verbatim, cannot serve as the basis for ultimate liability for copyright infringement. However, *the copying of even unprotected elements can have a probative value in determining whether the defendant copied the plaintiff's work. Where a court first extracts all unprotected elements of a work, and only compares protected elements, it deprives itself of the use of probative, and potentially essential, information on the factual issue of copying.* That is because, even if a court finds protectable elements of a program to be similar, it still must determine whether those elements were copied from the plaintiff's work, whether the duplication can be attributed to other factors, or whether its reproduction was pure chance. *The fact that non-protectable elements of the original program were also copied, although it cannot be the basis for liability, can be probative of whether protected elements were copied. That is because, in certain situations, it may be more likely that protected elements were copied if there is evidence of copying among the unprotected elements of the program.*

9 F.3d 832, n.7 (10th Cir. 1993) (emphasis added); *see also Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 101 (2d Cir. 2014); *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 370 n.9 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994).

The broader, holistic approach to the copying inquiry is also endorsed by Professor Nimmer:

If the unprotectable parts of [a copyrighted work] were excised from the comparison . . . nothing would remain to compare, as even 'original works broken down into their composite parts would usually be little more than basic [unprotectable] elements like letters, colors and symbols.' The excision would therefore render the very exercise of probative similarity useless, effectively impeding any inference as to the presence or absence of actual copying. Consequently, *the presence of unprotected elements in the probative similarity aids the inferential nature of the inquiry in a way that their categorical excision would hinder.*

29

4 Nimmer on Copyright § 13D.06 (emphasis added) (footnote omitted) (quoting *Bioson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001)).

Here, the District Court's conclusion that Biani's complaint failed plausibly to state a claim for copying was based on the application of the wrong test for "substantial similarity" and the very excising that Professor Nimmer warns against, as discussed below.

### B. The District Court Failed to Apply the Correct Test to Assess Whether the Complaint States a Plausible Claim for Copying.

In assessing whether the complaint plausibly alleged *copying* by Appellees, the District Court erroneously applied the test for *unlawful appropriation* and improperly excluded from consideration what the District Court deemed to be unprotectable elements of Biani's works.

After finding that Biani's characters Charlotte, Frederick and Landon were sufficiently delineated and especially distinctive and, therefore, qualified for copyright protection under *DC Comics* 802 F.3d 1012, the District Court addressed whether the complaint plausibly alleged copying by Appellees. Because the District Court concluded that the allegations in the complaint as to Appellees' access to Biani's works on the Forum did no more than "suggest a bare possibility of access," 1-ER-10 (quoting *Briggs*, 70 F. Supp. 3d at 1166), the District Court proceeded to assess whether the complaint plausibly alleged a "striking similarity" between the works.

30

Before undertaking this comparison, however, the District Court expressly and improperly "filter[ed] out" what it concluded were the "unprotectable elements" of Biani's works, contrary to the test for copying adopted by this Court. 1-ER-10. Specifically, the District Court expressly excluded from consideration the shared physical attributes of Charlotte and Vanessa, their similar depiction as "seductive" and "strong" women who engage in deviant behavior, and their common occupations as witches and herbalists, dismissing these attributes as "stock" aspects of the Victorian-era genre, noting that courts in the Ninth Circuit have deemed characteristics "at *similar levels of generality*" to be "*unprotectable*." 1-ER-11 (emphasis added).

The District Court also excluded consideration of the similarities between Landon and Sir Malcom as global explorers and the similarities between Landon and Vanessa as clairvoyant because it concluded that such attributes are *high-level unprotectable characteristics*. *Id.* (emphasis added). Nor did the District Court address the many other overlapping elements between Appellant's characters and those of the Show pled in the complaint, *including the common use by Appellant and Appellees of the likeness of actress Eva Green to portray Charlotte and Vanessa (see supra* 13-21)—presumably because those elements were filtered out as "unprotectable" under the extrinsic test.

The District Court's filtering out of what it deemed as a matter of law to be unprotectable elements of Appellant's works before evaluating whether the similarities between the works are probative of copying was improper under this

31

Court's holdings in *Rentmeester*, 883 F.3d at 1117, and *Skidmore*, 952 F.3d at 1064, and is reason alone to reverse. However, the District Court committed the additional errors discussed below.[6]

## II. The District Court Failed to Adhere to the "No Reasonable Juror" Standard and Instead Relied on its Own Subjective Assessment of the Complaint's Allegations of Copying.

In evaluating whether the complaint stated a claim of copying, the District Court also violated the principle that a copyright infringement claim may not be dismissed unless "no reasonable juror" could find in favor of the plaintiff. *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004). In copyright cases, this Court's adherence to the "no reasonable juror" standard has been unwavering. *Id.* This is the same stringent standard that restricts the authority of District Courts to render judgment notwithstanding a verdict under Rule 50 of the Federal Rules of Civil Procedure. *Williams v. Gaye*, 895 F.3d 1106, 1127 ("[i]t is not the courts' place to substitute our [subjective] evaluations for those of the jurors") (quoting *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003)); *Kaseberg v. Conaco, LLC*, 260 F. Supp. 3d 1229, 1235 (S.D. Cal. 2017).

---

[6] The District Court also did not compare Appellant's works to the Show *in its entirety* because the physical exhibit that Appellees manually submitted to the court with their motion to dismiss did not contain Episode One of Season One of the Show, which introduces Vanessa and other key characters. *See* 1-ER-5 ("The Court has reviewed Defendants' physical exhibits, properly submitted in support of their MTD, *although it notes that the 'Episode 1' folder did not contain any type of media*.") (emphasis added). Appellees' exhibits were thus incomplete and the District Court was unable to view the entirety of the Show.

The rule is necessary because the inquiry as to whether two works are sufficiently similar to support a claim for copyright infringement "is usually an extremely close question of fact." *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329-30 n.6 (9th Cir. 1983) (reversed and remanded summary judgment because "reasonable minds could differ"); *see also Baxter*, 812 F.2d at 424-25 (same); *L.A. Printex Indus. v. Aeropostale, Inc.*, 676 F.3d 841, 851 (9th Cir. 2012) ("genuine dispute of material fact" as to works' similarities). Due to the detailed nature of this factual inquiry, even on summary judgment, all literary inferences must be construed "in a manner most favorable to the non-moving party." *Shaw*, 919 F.2d at 1355; *accord Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 n.3 (9th Cir. 1994) (determining similarity between works as a matter law is "not highly favored"); *Atkins v. Fischer*, 331 F.3d 988, 995 (D.C. Cir. 2003) (same).

*A fortiori*, on a 12(b)(6) motion, disputes as to the degree of similarity between two works and all literary inferences to be drawn from the works must be construed in the plaintiff's favor. *See Dezendorf v. Twentieth Century-Fox Film Corp.*, 99 F.2d 850, 851 (9th Cir. 1938) (denying 12(b)(6) motion; though court may compare works' contents at pleading stage, "court will rarely interpose its judicial knowledge" as to originality/similarity); *Copeland v. Bieber*, 789 F.3d 484, 495 (4th Cir. 2015) (vacating judgment granting 12(b)(6) motion under "no reasonable juror standard").

While this rule has been developed in the context of this Court's extrinsic test for "substantial similarity" relating to unlawful appropriation, it applies for the same reasons to a court's inquiry as to the existence of similarities probative of copying. As Professor Nimmer explains, whether the similarities between a plaintiff's work and the allegedly infringing work are probative of copying is "a fact-intensive inquiry" in which, as here, "the question often arises whether a feature found in both works is attributable to plaintiff rather than to the genre (or field) as a whole." 4 Nimmer on Copyright § 13D.06[3][c]. "This investigation, in turn, requires the court to develop an understanding of the subject matter underlying the works, along with the available techniques and forms of creativity therein. When the subject matter at bar is technical, courts may need to avail themselves of expert testimony in order to assess the likelihood of copying *versus* other factors." *Id*.

Here, as explained above, the District Court excluded from the copying analysis many of the similarities that the complaint alleges are probative of copying because it found that these elements were generic *scènes à faire*. *See* 1-ER-11. The District Court did so as a matter of law, without the benefit of expert discovery or other evidence relating to the literary genre at issue. However, this Court has stated that "judges have no particular expertise in determining what is and is not generic in cases like these." *Astor-White v. Strong*, 733 F. App'x 407, 409 (9th Cir. 2018).

Where, as in this case, the similarity inquiry compares literary works to a television series, the analysis is especially open to a range of interpretations, requiring close analysis of the works' elements that often intertwine in "subtle and complex" ways. *Baxter*, 812 F.2d at 424. Whenever such expressive elements could yield conflicting reactions among jurors, the court must leave such questions to the jury to decide with the benefit of a full record, including expert testimony. Instead, the District Court here substituted its own subjective reactions for those of the jury and did so without the benefit of expert testimony or other evidence. This was improper. *See Alfred v. Walt Disney Co*., 821 F. App'x 727, 729 (9th Cir. 2020) (overturning determination that alleged similarities were "unprotected generic, pirate-movie tropes" because at pleading stage "it is difficult to know whether such elements are indeed unprotectable material" without additional evidence, including expert testimony); *Zindel v. Fox Searchlight Pictures, Inc.*, 815 F. App'x 158 (9th Cir. 2020) (reversing Rule 12(b)(6) dismissal where additional evidence, including expert testimony, would aid in objective analysis needed to determine extent and importance of similarities identified in works' expressive elements).

For example, rather than assess whether a reasonable juror could view the "commonality of Frederick having epilepsy and Vanessa having seizures" to be a striking similarity, the District Court instead substituted its own subjective view and concluded that this commonality was not striking because their ailments "[were] presented with different symptoms and causes." 1-ER-11. In so doing,

35

the District Court failed to treat the allegations in the complaint as true for purposes of Rule 12(b)(6), because the complaint alleges that the afflictions of Frederick and Vanessa involve the same symptoms (grand mal/tonic-clonic seizures through which the character is connected with evil forces) and the same causes (possession by evil spirits). 3-ER-445 to -46 at ¶ 57. In effect, the District Court became a jury of one and decided ultimate issues of fact without the benefit of a complete record and without allowing Biani to present evidence on this issue.

Faced with a complex determination concerning "similarity of expression," the District Court improperly failed to consider how reasonable minds might differ on the myriad points of comparison raised in the complaint. *Baxter*, 812 F.2d at 424. Instead of viewing the facts plead in the complaint, which must be taken as true for purposes of Rule 12(b)(6), from the perspective of a reasonable juror, the District Court improperly made "subjective determination[s]" of similarity that usurped the role of the "reasonable juror." *Shaw*, 919 F.2d at 1357.

## III. When Viewed Under the Correct Standard, the Complaint Plausibly Pleads Sufficient Facts to State a Claim for Copying.

To be sure, a copyright plaintiff may not avoid Rule 12(b)(6) dismissal merely by labeling *any* alleged similarity between the plaintiff's work and the accused infringing work as "striking." *Stabile*, 137 F. Supp. 3d at 1187. Here, however, the allegations of the complaint, when viewed under the correct legal standard, are sufficient to raise Appellant's right to relief above the speculative

level and to state a claim for relief that is plausible at the pleadings stage. *Twombly*, 550 U.S. at 555, 570.

Construing the complaint and the works in the light most favorable to Appellant, a reasonable jury could find that the similarities between Appellant's works and the Show were sufficient to state a claim. *See Jacobsen v. Desert Book Co.*, 287 F.3d 936, 941-42 (10th Cir. 2002) (reversing grant of 12(b)(6) motion). In this Circuit, for the similarities between two works to be probative of copying, the similarities need not be extensive; they need only be similarities "one would not expect to arise if the two works had been created independently." *Rentmeester*, 883 F.3d at 1117. Here, the complaint pleads extensive similarities between Appellant's works and the Show, including similarities in the appearance, traits, and personalities of Charlotte and Vanessa; the identical use of Eva Green's likeness to portray Charlotte and Vanessa; similarities in the life-stories of Frederick and Vanessa, on the one hand, and the life-stories of Landon and Sir Malcolm, on the other; and similarities in the appearance, character, and role of the familiars who are each held captive by Charlotte and Vanessa.

The nature and extent of the similarities between the works, taken together, are ones that one would not expect if the works had been created independently. *Id*. Absent any proof by Appellees of independent creation (which Appellees did not argue in their motion to dismiss), the nature and extent of the similarities make it implausible at the pleadings stage to believe that any similarity was pure

coincidence. As such, the complaint plausibly alleges facts upon which a reasonable juror could conclude that Appellees copied Appellant's works. *Id.*

Because the complaint plausibly alleges similarities probative of copying, it was erroneous for the District Court to conclude that Appellant's complaint could survive dismissal at the Rule 12(b)(6) stage only if she amended the complaint to plead additional facts regarding Appellees' access to her works. 1-ER-12. As noted, in reaching this conclusion, the District Court relied on cases decided at the summary judgment stage or later, *after discovery on the issue of access had been taken and presented to the court*. *See* supra 23-24. Here, discovery on access was not before the District Court when it dismissed Appellant's complaint.

It is well-established that "[t]here is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required." *Minx Int'l, Inc. v. Rue 21 Inc.*, No. 2:15-cv-05645-CAS (PLAx), 2017 U.S. Dist. LEXIS 107297, at *7-8 (C.D. Cal. July 10, 2017) (internal quotations and citations omitted); *see also* Nimmer on Copyright § 13D.08[4][b] ("[H]eightened similarity between two works allows an inference of actual copying, even when proof of access is minimal."). Under this principle, a greater pleading of similarity between the copyrighted works and the infringing works, *including similarities in unprotected elements*, allows a court to infer at the pleadings stage that the accused infringers, either directly or indirectly, had a

reasonable opportunity to view and copy the plaintiff's works.[7]  The complaint here pleads sufficient similarities between Appellant's works and the Show that are probative of copying under the standard applicable in this Circuit, which requires district courts to assess whether, taken together, the similarities between the protectable and unprotectable aspects of the copyrighted works and the defendant's works are plausibly ones that one would not expect had the works been created independently, and it pleads that Appellees directly or indirectly accessed Appellant's works on the Forum, including through the Forum moderators.  This is sufficient to state a claim of copying under Rule 12(b)(6) and to warrant reversal of the District Court's Order.

## <u>CONCLUSION</u>

The District Court's dismissal of Appellant's complaint was erroneous under this Court's standard for pleading and proving copying.  For the foregoing reasons, the judgment of the District Court should be reversed, and the case should be remanded to the District Court for further proceedings, including fact and expert discovery.

---

[7] This is distinguishable from *Skidmore*, 952 F.3d at 1069, where this Court overruled the so-called "inverse ratio rule," and held that a greater showing of *access* does not allow for a lower showing of *substantial similarity*.  *Skidmore* does not apply to the reverse proposition, where greater showing of *similarity* can result in a lower requirement to show *access*.

Date:  September 4, 2024                Respectfully submitted,

WHITE & CASE LLP

*/s/ Michael Hamburger*
Michael Hamburger
michael.hamburger@whitecase.com
**WHITE & CASE** LLP
1221 Avenue of the Americas
New York, NY  10020
Telephone:  (212) 819-8200
Facsimile:   (212) 354-8113

Michael Songer
michael.songer@whitecase.com
**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC  20006
Telephone:  (202) 626-3600
Facsimile:   (202) 639-9355

*Attorneys for Appellant Anna Biani*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32, I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,398 words, excluding the parts of the brief exempted by Fed. R. App. P 32(f).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type styles requirement of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 and Times New Roman 14-point font.


Date: September 4, 2024


*/s/ Michael Hamburger*
Michael Hamburger
michael.hamburger@whitecase.com
**WHITE & CASE**LLP
1221 Avenue of the Americas
New York, NY  10020
Telephone:  (212) 819-8200
Facsimile:   (212) 354-8113

## <u>STATEMENT OF RELATED CASES</u>

I do not know of any related cases in this Court.


Date: September 4, 2024.


/s/ *Michael Hamburger*

Michael Hamburger
michael.hamburger@whitecase.com
**WHITE & CASE**LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113